IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CHEN-LI SUNG, M.D., | ) | CIV. NO. 13-00024 JMS-KSC |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART |
| | ) | DEFENDANTS' MOTION TO DISMISS |
| vs. | ) | OR, IN THE ALTERNATIVE, FOR |
| | ) | SUMMARY JUDGMENT |
| DENNIS D. DOYLE, in his official | ) | |
| capacity as Commander of Tripler | ) | |
| Army Medical Center; et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Chen-Li Sung, M.D. ("Plaintiff" or "Sung"), an active duty

officer and doctor in the United States Army, was terminated from the Tripler

Army Medical Center ("TAMC") general surgery residency training program on

February 9, 2011.  Plaintiff filed a previous suit, *Sung v. Gallagher*, Civ. No. 11-

00103 JMS-KSC (D. Haw. filed Feb. 16, 2011) ("*Sung I*"), which challenged that

termination as a violation of due process and impermissible disability

discrimination.  This court dismissed that action without prejudice because

Plaintiff had not exhausted available administrative remedies before the Army

Board for the Correction of Military Records ("ABCMR").  Having now

exhausted such remedies, Plaintiff filed this suit against Defendants Dennis D.

Doyle,[1] in his official capacity as Commander of TAMC; Holly L. Olson, in her

official capacities as Director of Medical Education and Chairperson of the TAMC

Graduate Medical Education Committee ("GMEC"); and the GMEC itself

(collectively "Defendants" or "the Army"), again contending that his termination

from TAMC's residency program is void because he was denied due process and

was a pretext for unlawful disability discrimination.  Doc. No. 1, Compl. at 18-19.

Before the court is Defendants' Motion to Dismiss or, in the

Alternative, for Summary Judgment, Doc. No. 7, asserting that the court lacks

subject matter jurisdiction and, alternatively, that Plaintiff's claims fail on the

merits as a matter of law.  Based on the following, the court concludes that it has

subject matter jurisdiction, but GRANTS Defendants' Motion for Summary

Judgment.

///

///

///

---

[1]  Plaintiff named Brigadier General Keith W. Gallagher, in his official capacity as Commander of TAMC, as the primary Defendant in this action (as he did in *Sung I*).  The record, however, reflects that Brigadier General Gallagher was replaced as Commander of TAMC on November 1, 2012 by Brigadier General Dennis D. Doyle.  Doc. No. 7, Defs.' Mot. at 1 n.1. Accordingly, Dennis D. Doyle is substituted as the primary Defendant pursuant to Federal Rule of Civil Procedure 25(d).

## II.  **BACKGROUND**

In *Sung I*, the court issued two key Orders.  First, on June 30, 2011,

the court denied Sung's Motion for Preliminary Injunction, determining -- after an

extensive review of the record of TAMC's termination-of-residency proceedings --

that Sung failed to establish (1) a likelihood of success on the merits, (2) a

likelihood of irreparable harm, (3) a favorable balance of equities, and (4) that an

injunction would be in the public interest.  *See Sung v. Gallagher*, 2011 WL

2610136, at *12 (D. Haw. June 30, 2011) (Order Denying Plaintiff's Motion for

Preliminary Injunction).  The court later dismissed *Sung I* without prejudice for

failure to exhaust "available intraservice remedies."  *Sung v. Gallagher*, 2011 WL

4952617, at *5 (D. Haw. Oct. 17, 2011) (*quoting Wenger v. Monroe*, 282 F.3d

1068, 1072 (9th Cir. 2002)).[2]

---

[2]  The court explained that administrative remedies were available before the ABCMR, which is:

> an administrative body established pursuant to 10 U.S.C. § 1552.
> It consists of civilians appointed by the Secretary of the Army.  32
> C.F.R. § 581.3(c)(1).  Among other duties, "it directs or
> recommends correction of military records to remove an error or
> injustice." 32 C.F.R. § 581.3(c)(2)(i); *see also* 10 U.S.C.
> § 1552(a)(1) (allowing Secretary of a military department to
> "correct any military record  . . . when the Secretary considers it
> necessary to correct an error or remove an injustice.").

2011 WL 4952617, at *6.  The court reasoned that "[t]he Director of the ABCMR, Conrad V.
Meyer, has reviewed Sung's Complaint and attests that '[t]he Secretary of the Army or his
designee, acting upon the [ABCMR's] recommendation, can address MAJ Sung's claims
regarding wrongful termination from residency training,'" *id.*, including his "claims of

(continued...)

Those two Orders detail the circumstances of Sung's termination. The court's June 30, 2011 Order Denying Plaintiff's Motion for Preliminary Injunction examined and described the hearing and other process provided by the Army in terminating Sung from the TAMC surgical residency program, and analyzed the challenges Sung made to those processes. The court reviewed the record again in its October 17, 2011 Order dismissing *Sung I* without prejudice. The record in this case includes that same evidence, along with the decision and relevant documents from the subsequent ABCMR administrative review. Accordingly, the court draws heavily from those prior Orders in setting forth the background facts, and in reviewing his challenges in this action.

## A.   Background Leading to Termination from Residency

Sung graduated from Mount Sinai School of Medicine in New York City with a Doctor of Medicine degree on April 29, 1998. Doc. No. 8-2, Defs.' Mot. Ex. 2. He began a surgical residency at Saint Barnabas Medical Center in Livingston, New Jersey, on July 1, 1998. Doc. No. 8-3, Defs.' Mot. Ex. 3. He withdrew from his surgical residency during his second year, and worked in the

---

[2](...continued)
constitutional, statutory, and regulatory violations," and his claim of disability discrimination. *Id.* (citations omitted). *See Clinton v. Goldsmith*, 526 U.S. 529, 539 (1999) ("A servicemember claiming something other than monetary relief may challenge [an Air Force Board of Correction for Military Records'] decision to sustain a decision to drop him from the rolls (or otherwise dismissing him) as final agency action under the Administrative Procedure Act[.]").

financial field on Wall Street for the next five years.  Doc. No. 8-4, Defs.' Mot.

Ex. 4 at 3; Doc. No. 8-10, Defs.' Mot. Ex. 10 at 91.

On March 4, 2005, Sung was appointed as a Captain in the U.S. Army

Medical Department ("AMEDD").  Doc. No. 8-1, Defs.' Mot. Ex. 1.  He

completed the AMEDD Officer Basic course on May 13, 2005, and was assigned

to TAMC to resume a surgical residency on May 14, 2005.  Doc. No. 8-4, Defs.'

Mot. Ex. 4 at 5-7.  While at TAMC, he received high ratings on his officer

evaluation reports from 2005 to 2009.  Doc. No. 8-5, Defs.' Mot. Ex. 5 at 3-10.

He began his last year of surgical residency (his chief resident year) on May 14,

2009.  *Id.* at 1.

Sung had difficulties in his chief resident year.  Doc. No. 8-6, Defs.'

Mot. Ex. 6 at 1.  In July and August 2009, the general surgery program director,

Dr. Ronald Gagliano, counseled Plaintiff.  Dr. Gagliano stated that Sung "began

avoiding work due to stress."  Doc. No. 8-7, Defs.' Mot. Ex. 7 at 2.  In September

2009, Sung suffered a recurrence of "major depressive disorder," Doc. No. 1,

Compl. ¶ 11, and was on medical leave through November 2009.  Doc. No. 8-6,

Defs.' Mot. Ex. 6 at 1.  He returned to full duty on December 1, 2009, but was at a

"service remediation" level for sixty days.  *Id.*  The "causes of remediation" were

listed by Dr. Gagliano as:  "work avoidance/hard case avoidance," "poor patient

care," "not carrying out the administrative and supervisory duties of a [fifth year resident]," "relying on other residents to do his work and failure of appropriate supervision," and "interpersonal skills and communication, *i.e.*, reporting on other residents' patient assessments as his own." *Id.* at 1-2. Sung's Complaint asserts that the late-2009 recurrence of his depression was "attributable to conflicts between [Sung] and two of his superiors in the Department of Surgery who falsely accused [him] of being untruthful[.]" Doc. No. 1, Compl. ¶ 12.

On February 2, 2010, Dr. Gagliano recommended to the GMEC that Sung be put on probation. Doc. No. 8-7, Defs.' Mot. Ex. 7 at 2-9. The recommendation indicated that Sung had "failed [his] required rotation while on service level remediation for January 2010." *Id.* at 2. It documented, or alleged, certain incidents of substandard performance such as where Sung apparently mis-diagnosed a child who had appendicitis. *Id.* at 4. (Sung later disputed the details of these incidents. Doc. No. 8-9, Defs.' Mot. Ex. 9 at 3-10.) Sung accepted the probation plan on February 5, 2010. Doc. No. 8-7, Defs.' Mot. Ex. 7 at 1.

On March 3, 2010, Dr. Gagliano relieved Sung of his clinical duties, and recommended he be terminated from the surgical residency program. Doc. No. 8-8, Defs.' Mot. Ex. 8. Sung refused the proposed dismissal, and provided a lengthy written response disputing many of Dr. Gagliano's details and explaining

that he was being treated unfairly.  Doc. No. 8-9, Defs.' Mot. Ex. 9.  Sung elected

to appear before the GMEC with counsel.  *Id.* at 11.  A dismissal hearing was held

before the GMEC on March 29, 2010.  On April 5, 2010, the GMEC denied Dr.

Gagliano's recommendation to terminate Sung.  Doc. No. 8-10, Defs.' Mot. Ex. 10

at 114.  Sung's Complaint states that the GMEC found Sung "had been compelled

to work in a hostile environment."  Doc. No. 1, Compl. ¶ 12.[3]

Certain conditions, however, were placed on Sung being able to

remain in residency training, including allowing Sung to try to transfer to another

training program away from TAMC.  Doc. No. 8-10, Defs.' Mot. Ex. 10 at 114.  If

such a program was not found, Sung was to resume his residency at TAMC and

his probation would be continued.  *Id.*  By the end of April 2010, Sung was not

able to find a residency program outside TAMC, so he returned to TAMC where

he was placed on probation for two months.  *Id.* at 115.

---

[3]  Neither the transcript of the March 29, 2010 GMEC proceedings, nor any specific
findings from that proceeding, is part of the record.  Dr. Gagliano's successor (Dr. Dwight
Kellicut), however, told the GMEC on December 16, 2010:

> [d]uring [Sung's] initial dismissal hearing, there was a perception
> that perhaps the general surgery program was in fact toxic towards
> Capt. Sung; that we had unfairly singled him out. . . .  As I
> reviewed that whole process and looked at everything, perhaps in
> my mind I felt that [Capt.] Sung in certain situations had been
> targeted.  But . . . I wasn't there.

Doc. No. 8-10, Defs.' Mot. Ex. 10 at 10.

From June to August 2010, Sung performed "adequately" and was rated "satisfactory." *Id.* at 124-34.  On September 2, 2010, however, Sung was removed from providing patient care "for medical reasons." *Id.* at 136.  A new acting program director, Dr. Dwight Kellicut, wrote that

> [Sung's] performance over the last five weeks has degraded substantially, *i.e.*, oversleeping for rounds, sleeping 20+ hours at a time, missing meals due to no appetite.  Residents report seeing him sleeping excessively in the call room which culminated in his absence from academic conference yesterday and his failure to complete required Morbidity and Mortality Reports in a timely fashion.

*Id.*  Dr. Kellicut acknowledged Sung's illness:

> I have a real and honest concern for this resident's well being and his ability to care for patients safely. . . .  CPT Sung's difficulties, in my opinion, are due to severe depression and emotional stress. . . .  CPT Sung is technically able to operate and he is in good academic standing.  However, being a surgeon and making life and death decisions require someone who is 100% at all times, not someone who is 60% at best [as Sung has estimated] . . . .  I recommended he see his psychiatrist immediately.

*Id.* at 137.  On September 8, 2010, Sung was suspended from patient care, pending a mental health evaluation.  *Id.* at 138.

On November 22, 2010, Sung was notified that the program director was recommending that he be terminated from the TAMC General Surgery

8

Residency training program, based on his "regression after removal from probation."  According to the notification, "there was consensus [with the program faculty] that you remain deficient in your performance despite remediation and probation."  *Id.* at 139.  The notification referenced the prior September 2, 2010 and September 8, 2010 suspension memoranda.  Sung acknowledged the recommendation on November 24, 2010.  *Id.* at 140.  On December 1, 2010, after receiving a notice from Dr. Kellicut, Sung indicated that he did not accept the proposed dismissal and exercised his rights to present evidence to the GMEC, to have witnesses appear on his behalf, and to have an attorney present.  *Id.* at 141.

Sung appeared before the GMEC to challenge his termination.  *Id.*  at 1.  Sung's termination proceedings were conducted pursuant to the United States Army Medical Command's "Policy on Due Process for Participants in Military Graduate Medical Education Programs" (the "Due Process Policy").  *See* Doc No. 8-12, Defs.' Mot. Ex. 12.  A hearing before the GMEC was held on December 16, 2010, where Sung appeared with counsel.  Doc. No. 8-10, Defs.' Mot. Ex. 10. Under the applicable rules, however, counsel "may not ask questions or make arguments or address committee members during the proceedings, but the trainee may consult the attorney."  Doc. No. 8-12, Defs.' Mot. Ex. 12 at 18.  Sung proceeded to ask questions and represent himself, with counsel at his side for

consultation.  *See, e.g.*, Doc. No. 8-10, Defs.' Mot. Ex. 10 at 21-31, 37-55, 79-83.

The Due Process Policy -- adopted by TAMC in essential form and followed in Sung's termination proceeding -- provides that a program director can recommend termination of a resident, but termination itself must be approved by at least a two-thirds vote by secret ballot of a GMEC.  Doc. No. 8-12, Defs.' Mot. Ex. 12 at 11.  It provides a resident with extensive rights prior to termination, including (1) the right to hear the reasons for action as put forth by the program director, (2) the right to review all documents before the committee, (3) the right to legal counsel (who may not ask questions or make arguments during the proceedings, but who may advise the resident), (4) the right to respond both orally and in writing to the program director's statements, (5) the right to present testimony of witnesses, (6) the right to submit statements or documentation, or other information, to show why termination should not occur, and (7) the right to appeal the decision.  *Id.* at 16; *see also* Doc. No. 8-13, Defs.' Mot. Ex. 13 at 23-24 (setting forth same rights in the TAMC Handbook for Residents).

Under the Due Process Policy, a recommendation for dismissal must be based on:  (1) failure to satisfactorily progress toward correction of deficiencies while on probation; (2) regression or failure to satisfactorily progress after removal from probation; or (3) any act of gross negligence or willful misconduct.

Doc. No. 8-13, Defs.' Mot. Ex. 13 at 16.  The program director must notify the resident in writing that dismissal is being considered, and the notification must include "specific reasons" for the proposed dismissal.  *Id.*  A resident is then given a minimum of five working days to submit a written response.  *Id.*  A hearing may be convened, which must be at least ten working days after notification to the resident.  *Id.* at 16-17.  The GMEC itself decides whether to terminate a resident -- the program director does not vote.  *Id.* at 17.  Deliberations and voting are done in closed session, although the decision is documented with confidential written records.  *Id.*  The resident may file an appeal of a dismissal to the TAMC Commander.  *Id.* at 18.  The TAMC's decision is final, and there is no right to further appeal in the Due Process Policy beyond the TAMC Commander.  *Id.*

On December 20, 2010, the GMEC agreed with Dr. Kellicut's recommendation and Sung's surgical residency was terminated.  Doc. No. 1, Compl. ¶ 35; *Sung*, 2011 WL 4952617, at *4 (citing Pl.'s Mot. Ex. O in Civ. No. 11-00103).  An appeal, through counsel, was filed with the then-TAMC Commander, Brig. Gen. Keith W. Gallagher.  Doc. No. 1, Compl. ¶ 36; *Sung*, 2011 WL 4952617, at *4.  The appeal was denied on February 9, 2011, and Sung's termination became final.  Doc. No. 1, Compl. ¶ 37; *Sung*, 2011 WL 4952617, at *4.

**B.     Background Leading from *Sung I* to the ABCMR Proceedings**

Plaintiff filed *Sung I* on February 16, 2011, followed by an Amended

Complaint on April 26, 2011.  *Sung I*, Doc. Nos. 1, 9.  On June, 30, 2011, the

court denied Plaintiff's Motion for Preliminary Injunction, which sought (among

other relief) immediate reinstatement into the TAMC residency program.  *Sung*,

2011 WL 2610136, at *13.  The court later dismissed *Sung I* for failure to exhaust

administrative remedies on October 17, 2011.  *Sung*, 2011 WL 4952617, at *1.

The court concluded:

> Sung may seek review in this court under the
> [Administrative Procedure Act, 5 U.S.C. § 701 et seq.,
> ("APA")] after a decision by the ABCMR. . . .  The First
> Amended Complaint is dismissed without prejudice.
> The Clerk of Court is directed to enter judgment in favor
> of Defendants and close the case file.  If Plaintiff refiles
> an action under the [APA] in this district -- after he
> exhausts administrative remedies before the [ABCMR] --
> such new action may be reassigned to this court under
> Local Rule 40.1[.]

*Id.* at *7 (internal citations omitted).

Accordingly, on December 6, 2011, Plaintiff filed with the ABCMR

an "Application for Correction of Military Record Under the Provisions of Title

10, U.S. Code, Section 1552" ("ABCMR Application").  Doc. No. 8-19, Defs.' Ex.

19 at 23.  The ABCMR Application raised similar, if not identical, issues that

12

Plaintiff alleged in the Amended Complaint in *Sung I.  See id.* at 24-27; *see also id.* at 5 (indicating that Sung submitted a copy of the Amended Complaint with his ABCMR Application).

Specifically, Plaintiff's ABCMR Application raised the following errors or injustices:

(1)  Denying me procedural due process by failing to provide me with adequate notice to sufficiently prepare for the GMEC hearing, denying me the right to be represented by counsel therein, and unreasonably delaying the decision on my appeal of the GMEC's recommendation.  *See* Tripler's Due Process Policy for Residents in the Graduate Medical Education Program §§ 10(c) and 10[(j)].

(2)  Denying me substantive due process by arbitrarily and capriciously dismissing me from the Surgical Residency Program for reasons that were impermissibly discriminatory, violated the Army's own regulations, and/or pretextual for the animus and hostile work environment I endured in the Surgery Department at Tripler.

(3)  Dismissing me from the Surgical Residency Program based solely on my disability in violation of applicable policies, rules, and regulations.  *See* "Policy Guidance for Deployment - Limiting Psychiatric Conditions and Medications" issued by the Assistant Secretary of Defense; 32 C.F.R. §§ 56.4 and 56.8; "Army Policy on Harassment" dated July 32, 2008; DOD Directive No. 1020.1; Army Regulation 600-7; Chapter 11 of Army Regulation 40-68; Army Regulation 40-501; and Army Regulation 40-400.

13

*Id.* at 26.

On November 27, 2012, the ABCMR issued a thirteen-page single-spaced decision denying the ABCMR Application.  *Id.* at 3-15.  The ABCMR concluded in part:

> A review of the governing policy and the actions of the GMEC failed to show any breach of [Sung's] rights to due process.  He was adequately notified of his GMEC hearings in accordance with the governing policy.  Furthermore, there is no evidence showing that he was arbitrarily and capriciously dismissed for any reasons that were discriminatory.  His dismissal was solely based on his regression as evidenced by his failure to complete assignments and to convincingly show he was competent to practice independently, without supervision as a surgeon.

*Id.* at 15.  The decision also reviewed and incorporated an advisory opinion, also reviewing Sung's termination, that the ABCMR had sought from the Army's Office of the Surgeon General.  *Id.* at 11, 18-22.  In turn, as for alleged improper disability discrimination, that advisory opinion concluded in part:

> CPT Sung's depression is certainly a mitigating factor, but it does not absolve him of the responsibilities of meeting established academic and professionalism standards.  Multiple psychiatrists testified on his behalf. At least two psychiatrists and one psychologist were voting members of the GMEC present for the hearing. Given the testimony heard and the composition of the GMEC, it is not conceivable that his depression served as the basis for the decision to terminate him from

14

training.  Testimony shows there were multiple issues to consider; the assertion that the decision to terminate was arbitrary and capricious is not tenable.

*Id*. at 19.

## C.   Procedural Background for the Present Action

On January 15, 2013, Plaintiff filed this action, again asserting procedural and substantive due process violations in his termination from the residency program.  Doc. No. 1, Compl. at 16-18.  On August 1, 2013, Defendants filed their Motion to Dismiss.  Doc. No. 7.

Defendants' Motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting a lack of subject matter jurisdiction because the Complaint does not specifically invoke any provision of the APA (and without such allegations, Defendants contend that the United States retains sovereign immunity).  Alternatively, the Motion cites Federal Rule of Civil Procedure 56 and argues that Defendants are entitled to Summary Judgment on the merits.  *Id.* at 15-34.  Defendants support their Motion with an evidentiary record and a Concise Statement of Facts.  Doc. No. 8.  The court thus construes the Motion (although titled only as a Motion to Dismiss) as a Motion to Dismiss or, in the Alternative,

for Summary Judgment.[4]  Plaintiff filed his Opposition on November 21, 2013,

Doc. No. 16, and Defendants filed their Reply on December 2, 2013.  Doc. No. 17.

The court heard the Motion on December 16, 2013.

### III.  <u>STANDARDS OF REVIEW</u>

**A.    Rule 12(b)(1) -- Subject Matter Jurisdiction**

A challenge under Federal Rule of Civil Procedure 12(b)(1) for lack

of subject matter jurisdiction may be either "facial" or "factual."  *Wolfe v.*

*Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  "In a facial attack, the challenger

asserts that the allegations contained in a complaint are insufficient on their face to

invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes

the truth of the allegations that, by themselves, would otherwise invoke federal

jurisdiction."  *Id.* (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039

(9th Cir. 2004)).  With a facial attack, the nonmoving party is not required to

provide evidence outside the pleadings, and the court assumes allegations in the

complaint to be true.  *Wolfe*, 392 F.3d at 362.

But where a Rule 12(b)(1) motion attacks "the substance of a

complaint's jurisdictional allegations despite their formal sufficiency [the movant

---

[4]  In Opposition, Plaintiff did not submit a responsive Concise Statement of Facts, but instead incorporated the arguments he made in opposing dismissal or summary judgment in *Sung I* and argues that the matter should proceed to trial.  *See* Doc. No. 16, Pl.'s Opp'n at 5-7.

may] rely on affidavits or any other evidence properly before the court." *St. Clair v. Chico*, 880 F. 2d 199, 201 (9th Cir. 1989). "With a [Rule] 12(b)(1) motion, a court may weigh the evidence to determine whether it has jurisdiction." *Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005). Where "the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment." *Id.* (quoting *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987)).

## B.    Rule 56 -- Summary Judgment

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine

17

issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn

in his favor." (citations omitted)).

## C.     The APA and Deferential Review of ABCMR Decisions

Under the APA, among other relief, a court

shall decide all relevant questions of law, interpret
constitutional and statutory provisions, and determine
the meaning or applicability of the terms of an agency
action.  The reviewing court shall --

(1) compel agency action unlawfully withheld or
unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings,
and conclusions found to be --
        (A) arbitrary, capricious, an abuse of discretion, or
        otherwise not in accordance with law;
        (B) contrary to constitutional right, power,
        privilege, or immunity;
        (C) in excess of statutory jurisdiction, authority, or
        limitations, or short of statutory right; [or]
        (D) without observance of procedure required by
        law[.]

5 U.S.C. § 706.

Courts apply a de novo review to due process claims under 5 U.S.C.

§ 706(2)(B).  *Carpenter v. Mineta*, 432 F.3d 1029, 1032 (9th Cir. 2005).  *See also*

*Darden v. Peters*, 488 F.3d 277, 284 (4th Cir. 2007) ("[J]udicial review [under

§ 706(2)(B)] of a claim that the agency's actions violated a claimant's

constitutional rights is conducted de novo.").  In other words, "APA claims

advanced on the basis of constitutional rights, under § 706(2)(B), require an

independent judicial determination of the litigant's rights." *Porter v. Califano*, 592 F.2d 779, 780 (5th Cir. 1979). "[A] reviewing court owes no deference to the agency's pronouncement on a constitutional question.'" *J.J. Cassone Bakery, Inc. v. N.L.R.B.*, 554 F.3d 1041, 1045 (D.C. Cir. 2009) (quoting *Lead Indus. Ass'n v. E.P.A.*, 647 F.2d 1130, 1173-74 (D.C. Cir. 1980)).

Of course, a deferential standard applies to an agency's factual findings and ultimate decision. "If the evidence contained in the administrative record is susceptible to more than one rational interpretation, a reviewing court may not substitute its judgment for that of the agency." *Hensala v. Dep't of Air Force*, 343 F.3d 951, 955 (9th Cir. 2003) (reviewing a district court's order granting summary judgment that, in turn, reviewed a decision under the APA of the Air Force Board for Correction of Military Records).

"A district court reviews an ABCMR decision to determine if it is arbitrary, capricious or unsupported by substantial evidence." *Burns v. Marsh*, 820 F.2d 1108, 1110 (9th Cir. 1987) (citing *Chappell v. Wallace*, 462 U.S. 296, 303 (1983) (other citation omitted)); *see also, e.g.*, *Dibble v. Fenimore*, 545 F.3d 208, 216 (2d Cir. 2008) ("[R]ulings of a Board for the Correction of Military Records can be set aside only if they are arbitrary, capricious, or unsupported by substantial evidence.") (citations omitted). "In determining whether the Board's

decision was not arbitrary or capricious, a court may not assess the wisdom of an

agency's choice; inquiry is limited instead to whether the Board has made a clear

error of judgment." *Dibble*, 545 F.3d at 216 (citation and internal quotation marks

omitted).  "An agency decision is arbitrary and capricious 'if the agency has relied

on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency

expertise.'" *Nw. Envt'l Defense Ctr. v. Bonneville Power Admin.*, 477 F.3d 668,

687 (9th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.

Ins. Co.*, 463 U.S. 29, 43 (1983)).

 "The deference that courts must show the agency's decision increases

when . . . the decision involves a military context." *Dibble*, 545 F.3d at 216.

Decisions of a military correction board are reviewed under an "unusually

deferential application of the 'arbitrary and capricious' standard" of the APA.

*Musengo v. White*, 286 F.3d 535, 538 (D.C. Cir. 2002) (quoting *Kreis v. Sec'y of

Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)); *see also Piersall v. Winter*, 435

F.3d 319, 324 (D.C. Cir. 2006).  "All that is required is that the Board's decision

minimally contain a rational connection between the facts found and the choice

made." *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (other citation and internal quotation marks omitted)).

## IV. <u>DISCUSSION</u>

### A.    The Complaint Sufficiently Raises an APA Challenge

Defendants first argue that the court should dismiss the Complaint for lack of subject matter jurisdiction -- the Complaint cites only 28 U.S.C. § 1331 (general federal question jurisdiction), and 28 U.S.C. § 1343 (jurisdiction for federal civil rights claims).[5]  Doc. No. 1, Compl. ¶ 2.  Defendants contend that such general jurisdictional statutes are insufficient to waive the federal government's sovereign immunity.  *See, e.g.*, *Hughes v. United States*, 953 F.2d 531, 539 n.5 (9th Cir. 1992) ("A mere assertion that general jurisdictional statutes apply does not suffice to confer jurisdiction when . . . the government did not waive its immunity."); *Trackwell v. United States*, 472 F.3d 1242, 1244 (10th Cir. 2007) (indicating that neither § 1331 nor § 1343(a)(4) waives the United States' sovereign immunity).  Defendants essentially claim that "the allegations contained

---

[5] As relevant here, section 1343 provides, in part that "[t]he district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."  28 U.S.C. § 1343(a)(4).

in [Sung's] complaint are insufficient on their face to invoke federal jurisdiction."

*Wolfe*, 392 F.3d at 362.  That is, they raise (as a matter of pleading) a facial, not a

factual, challenge to the court's subject matter jurisdiction.

   The parties, however, correctly agreed at the December 16, 2013

hearing that federal courts have jurisdiction under 5 U.S.C. § 702[6] of the APA to

review decisions of the ABCMR.  *E.E.O.C. v. Peabody Western Coal Co.*, 610

F.3d 1070 (9th Cir. 2010), explains that, prior to 1976, "prospective relief against

federal officials was available under the fiction of *Ex parte Young*."  *Id.* at 1085.

"However, since 1976 federal courts have looked to § 702 of the [APA] to serve

the purposes of the *Ex parte Young* fiction in suits against federal officers."  *Id.*

And such a review can incorporate Sung's claims of constitutional, statutory, and

regulatory violations, including his claim of disability discrimination.  *See Sung*,

2011 WL 4952617, at *6; *Goldsmith*, 526 U.S. at 539 ("A servicemember

claiming something other than monetary relief may challenge [an Air Force Board

of Correction for Military Records'] decision . . . as final agency action under the

[APA.]").  Although the Complaint fails to mention § 702 in particular (much less

the APA at all), the Complaint alleges several times that Defendants acted

---

  [6] Section 702, entitled "Right of review," provides in part that: "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

"arbitrarily and capriciously" in violation of constitutional, statutory, and regulatory provisions. *See, e.g.*, Doc. No. 1, Compl. ¶¶ 1, 43, 49 & p.18. Accordingly, Defendants conceded at the hearing that the court may proceed to the merits of the review under the APA.[7]

## B.   Sung's Termination Was Not Arbitrary, Capricious, Contrary to Constitutional Right, or Otherwise in Violation of Federal Law

Defendants next argue that they are entitled to summary judgment on the merits -- they contend that the ABCMR did not act arbitrarily or capriciously, and it properly determined that the GMEC did not violate Sung's due process rights or commit unlawful disability discrimination.  The court agrees.

Upon close review of the ABCMR's November 27, 2012 decision, the court easily concludes that it was not arbitrary or capricious, and it was supported by substantial evidence.  Indeed, the ABCMR reviewed the same evidence that this court carefully reviewed in *Sung I*, in which this court found when ruling on Sung's Motion for Preliminary Injunction that -- because the GMEC did not act arbitrarily or capriciously -- Sung had little likelihood of

---

[7]  In any event, given the court's prior Orders in *Sung I* -- which discuss the APA and *anticipate* this action seeking possible review of a decision of the ABCMR under the APA -- it is obvious that Plaintiff intended this action, at minimum, to invoke the APA.  Further, Defendants have included with their Motion sufficient documentation from the ABCMR administrative record, indicating that Defendants were not prejudiced or confused by Plaintiff's failure to cite to the APA specifically.

success on his procedural or substantive due process claims or claims of disability

discrimination. The ABCMR gave Sung the opportunity to provide any additional

documentation, which Sung declined to provide. Doc. No. 8-19, Defs.' Ex. 19 at

5. It made independent findings. *Id.* at 5-9. And it sought a further opinion from

the U.S. Army's Surgeon General. *Id.* at 21. In turn, the Army Surgeon General

reviewed the circumstances of Sung's termination from the TAMC residency

program, found no basis for his allegations, and recommended denial of his

ABCMR Application. *Id.* at 18-20. In response, Sung made little or no effort to

comment or contest that recommendation, other than contending that it was

"unprofessional." *See id.* at 13, 17.

In his cursory written Opposition to Defendants' Motion, Sung argues

that the ABCMR "ignored the uncontradicted testimony from his personal and

command designated physicians that because Dr. Sung had responded so well in

his treatment they had no reservations about restoring him to full duty and

allowing him to be deployed." Doc. No. 16, Pl.'s Opp'n at 6. In particular, at the

December 16, 2013 hearing, Sung's counsel pointed to the testimony of (1) Dr.

Morris (Chief of outpatient psychiatry at TAMC), who performed a "command-

directed evaluation and followup" of Sung, Doc. No. 8-10, Defs' Ex. 10 at 38; and

(2) Dr. Levy (Sung's treating psychiatrist). *Id.* at 56. But the ABCMR decision

certainly indicates that the ABCMR was aware that "[Sung's] psychiatrists found him fit and recommended his return to duty without restriction[.]"  Doc. No. 8-19, Defs' Ex. 19 at 4, 10.  It also knew that Sung has continued on active duty as an Army physician -- the ABCMR also rejected Sung's challenge to the Army's retaining him on active duty until 2016 as an Army general medical officer (or general practitioner).  *Id.* at 15, 20.  And its decision was based on the entire record -- it did not simply ignore the testimony of Sung's physicians.  Moreover, the relevant proceedings before the GMEC, the ABCMR, and this court have all focused on whether Sung was improperly terminated from a *surgical residency* program -- not whether he is qualified to be an Army physician on active duty.  Whether or not Army physicians "had no reservations about restoring him to full duty and allowing him to be deployed" says little about whether officials would have similar reservations about his ability to continue as a surgical resident and general surgeon in the Army.

And in considering Sung's argument under the required standard of review, nothing in the record indicates that the ABCMR relied on improper factors, "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence" before it.  *Bonneville Power Admin.*, 477 U.S. at 687.  The ABCMR's decision was not

26

"so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* It certainly "minimally contain[s] a rational connection between the facts found and the choice made." *Frizelle*, 111 F.3d at 176.[8]

Moreover, the court's decision is driven by its own careful review of the record. The court extensively studied the record of the GMAC termination hearing when the court denied Sung's prior Motion for Preliminary Injunction -- and the record of that hearing has not changed. Further, in this action, the court *again* reviewed the record, and reaches the same conclusion. The court thus reiterates much of its prior analysis here in concluding that Sung, under applicable standards of review, was not denied procedural or substantive due process, and

---

[8] To be clear, the court's decision is not based upon an interpretation of the APA that limits the court to reviewing whether the ABCMR abused its discretion in, in turn, determining that the GMEC did not abuse its discretion. Among its conclusions, the ABCMR stated "[f]urthermore, there is no evidence showing that [Sung] was arbitrarily and capriciously dismissed for any reasons that were discriminatory." Doc. No. 8-19, Defs.' Ex. 19 at 15. But the ABCMR did not confine itself to a narrow review of the GMEC's actions in analyzing whether Sung's constitutional and disability-related rights were unlawfully infringed. The ABCMR clearly concluded, for example, that "[a] review of the governing policy and the actions of the GMEC failed to show any breach of the applicant's rights to due process." *Id.* It continued: "[Sung's] dismissal was solely based on his regression as evidenced by his failure to complete assignments and to convincingly show he was competent to practice independently, without supervision[,] as a surgeon." *Id.*

In short, the court performed a unitary review of the record -- the court's task in reviewing this decision of the ABCMR necessarily entails reviewing the same evidence presented to (and process given by) the GMEC. Thus, even if there is some basis under the APA or otherwise for the court to review the GMEC's decision directly -- as Plaintiff appeared to argue at the December 16, 2013 hearing -- the result is the same. That is, neither the ABCMR's decision nor the GMEC's decision as reflected in Dr. Kellicut's termination of Sung's residency (as analyzed below) was arbitrary, capricious, contrary to constitutional right, or otherwise not in accordance with law.

was not subject to improper disability discrimination.  The court draws extensively

from its June 30, 2011 Order.

### 1.    *Due Process Principles in a Medical Residency Termination*

To evaluate the strength of Sung's due process claim, the court

applies *Stretten v. Wadsworth Veterans Affairs Hospital*, 537 F.2d 361 (9th Cir.

1976), and *Ong v. Tovey*, 552 F.2d 305 (9th Cir. 1977), both of which analyzed

due process challenges by medical residents terminated from federal residency

programs.  The court ordinarily first determines whether a protected property or

liberty interest is at stake, and if so, then addresses whether, in light of the

competing interests of the individual and the government, the procedures afforded

plaintiff satisfied due process.  *Stretten*, 537 F.2d at 365; *Ong*, 552 F.2d at 307.

The Army, however, has not contested whether Sung has a property

interest in continuing his residency.  Rather, it assumes Sung has a

constitutionally-protected interest, but argues that the process provided in his

GMEC proceeding was more than sufficient.  *Cf. Stretten*, 537 F.2d at 367

(holding that "Dr. Stretten's claim to his residency is a property interest deserving

of appropriate due process before it is removed," relying on particular language in

his appointment form).  The court thus focuses on the process that was provided.

"[D]ue process, unlike some legal rules, is not a technical conception

with a fixed content unrelated to time, place and circumstances." *Ong*, 552 F.2d at 307 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Mathews*, 424 U.S. at 334). *Mathews* set forth three factors to consider:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of (a property) interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.*

Considering those factors in a medical residency context, *Stretten* held that "due process does not require a full adversary hearing either before or after termination [of a medical residency]." 537 F.2d at 369. The Ninth Circuit reasoned that "[t]he ultimate decision-maker must have wide discretion in considering the evidence against a resident[,] includ[ing] the power to attach great value to the considered opinions of the resident's colleagues." *Id. Stretten* set forth the following standards, well short of a full adversary hearing:

> The resident's interest is important enough that he

should have notice of his deficiencies, should have an
opportunity to examine the evidence against him, and
should be allowed to present his side of the story to the
decision-maker.  These procedures will insure that all
relevant data are before the decision-maker and will
allow the terminated resident and any reviewing court to
judge whether the decision-maker acted in bad faith or
arbitrarily and capriciously.

*Id.*

Applying *Stretten*, *Ong* addressed a situation where a doctor was

suspended from a surgical residency program without formal notification

(although his operating privileges had previously been limited) and without a prior

formal adversarial hearing.  552 F.2d at 305.  After termination, the resident and

his attorney met with the decision-making doctors in a "question and answer"

session that allowed "the opportunity to question the other doctors and the

decision-makers about how they arrived at their decision to terminate [the

resident] from his residency program."  *Id.* at 308.  That post-termination process

"satisfied the *Stretten* standard that the decision-maker have enough data before

him that his decision to terminate is not arbitrary, capricious or unfair."  *Id.*  *Ong*

held that:

the government's interest in protecting patients from
medical incompetence outweighs the physician's private
interest in greater income and higher position.  In cases
such as this where doctors work very closely together

30

> and the decision to terminate a resident is made based
> upon their personal observation, less rigid procedures are
> necessary to prevent an "erroneous deprivation" of the
> resident's property interest.

*Id.* at 307.  Although the procedures used were not "the best possible," *Ong*

determined "they satisfied the basic requirements of constitutional due process."

*Id.*

### 2.    *Application to Plaintiff's Termination*

Applying the preceding due process principles, Sung's due process

challenge to his termination of residency proceedings fails.  As set forth above,

Sung's termination was conducted pursuant to the Due Process Policy (*i.e.*, the

United States Army Medical Command's "Policy on Due Process for Participants

in Military Graduate Medical Education Programs").  *See* Doc. No. 8-12, Defs.'

Mot. Ex. 12.  The Due Process Policy -- adopted by TAMC in essential form and

followed in Sung's termination proceeding -- provides that a program director can

recommend termination of a resident, but termination itself must be approved by at

least a two-thirds vote by secret ballot of a GMEC.  *Id.* at 11.  It provides a

resident with extensive rights prior to termination, including (1) the right to hear

the reasons for action as put forth by the program director; (2) the right to review

all documents before the committee; (3) the right to legal counsel (who may not

31

ask questions or make arguments during the proceedings, but who may advise the resident); (4) the right to respond both orally and in writing to the program director's statements; (5) the right to present testimony of witnesses; (6) the right to submit statements or documentation, or other information, to show why termination should not occur; and (7) the right to appeal the decision. *Id.* at 13; *see also* Doc. No. 8-13, Defs.' Mot. Ex. 13 at 24-25 (setting forth same rights in the TAMC Handbook for Residents).

Under the Due Process Policy, a recommendation for dismissal must be based on: (1) failure to satisfactorily progress toward correction of deficiencies while on probation; (2) regression or failure to satisfactorily progress after removal from probation; or (3) any act of gross negligence or willful misconduct. Doc. No. 8-13, Defs.' Mot. Ex. 13 at 16. The program director must notify the resident in writing that dismissal is being considered, and the notification must include "specific reasons" for the proposed dismissal. *Id.* A resident is then given a minimum of five working days to submit a written response. *Id.* A hearing may be convened, which must be at least ten working days after notification to the resident. *Id.* at 16-17. The GMEC itself decides whether to terminate a resident -- the program director does not vote. *Id.* at 17. Deliberations and voting are done in closed session, although the decision is documented with confidential written

records.  *Id.*  The resident may file an appeal of a dismissal to the TAMC

Commander.  *Id.* at 18.  The TAMC's decision is final, and there is no right to

further appeal (in the Due Process Policy) beyond the TAMC Commander.  *Id.*

Facially, the Due Process Policy easily complies with the minimum

standards set forth in *Stretten*.  Under the Due Process Policy, a resident is

(1) given ample and timely notice of alleged deficiencies, (2) has an opportunity to

examine the evidence against him, and (3) is allowed to "present his side of the

story" to the GMEC.  *Stretten*, 532 F.2d at 369.  The procedures "insure[] that all

relevant data are before the decision-maker," and are sufficient to "allow the

terminated resident and any reviewing court to judge whether the decision-maker

acted in bad faith or arbitrarily and capriciously."  *Id.*  Indeed, the procedures well

exceed the process provided in *Ong*.  *See* 552 F.2d at 307.

And Sung's termination process in fact complied in all essential

respects with the Due Process Policy.  He was provided with a notice of proposed

termination and the reasons supporting termination (the September 2, 2010 and

November 22, 2010 memoranda from program director Dr. Kellicut).  *See* Doc.

No. 8-10, Defs.' Ex. 10 at 137-141.  The notice indicated proposed termination for

"regression or failure to satisfactorily progress after removal from probation."  *Id.*

at 140.  The memoranda outlined in detail the reasons for Sung's suspension from

duties -- oversleeping for rounds, sleeping twenty hours at a time, sleeping excessively in the call room, absence from an academic conference, and failure to complete required "morbidity and mortality reports." *Id.* at 137.  According to Dr. Kellicut, Sung admitted his performance on a daily basis was only "adequate sixty-percent of the time." *Id.*

Further, at the December 16, 2010 termination hearing (as well as before the hearing) Sung had ample opportunity to examine the evidence against him.  He met with Dr. Kellicut before the hearing.  He asked pertinent questions at the hearing, especially regarding the effect of his disability on his performance. He examined Dr. Kellicut.  *Id.* at 21-32.  He presented three witnesses of his own -- his examining and treating psychiatrists, Drs. Morris and Levy, and an "ombudsman," Dr. Zagorski.  *Id.* at 44, 57, 80.  Sung testified on his own behalf, presenting his case passionately and with clarity.  *Id.* at 90-96.  Many of the nineteen members of the GMEC asked pertinent questions regarding Sung's performance and competency, and how his depressive disorder might affect his performance, both during training and as a surgeon.  *See, e.g.*, *id.* at 36, 46-49, 54-55, 59, 63, 67, 76, 80, 87, 88, 90.

At the December 16, 2013 hearing on the present Motion, Sung singled out the testimony of Drs. Morris and Levy, and argued that the GMEC

34

treated their testimony arbitrarily or capriciously.  Accordingly, after the hearing, the court again examined the record, focusing on how the GMEC dealt with their testimony.  The court finds nothing arbitrary or capricious in the GMEC's treatment of Drs. Morris and Levy, or in its application of the Due Process Policy. On the contrary, the record reflects that most of the panel members asked pointed and relevant questions of both witnesses, probing the possible relationship between Sung's depression, the possibility of recurrence, and his *performance* as a surgical resident and potential as an Army surgeon.  *See, e.g.*, Doc. No. 8-10, Defs.' Ex. 10 at 42 (Kellicut); 43, 69, 74 (Thornsvard); 44, 50, 52, 74 (Lentz-Kapua); 45 (Guinto); 46, 62, 75 (Studer); 48 (Drouillard); 49, 61 (Johnson); 52, 65 (Brown); 64, 71 (Olson); 68 (Hawley); 71 (Shimamoto); 76 (Sneshkoff); and 78 (Jex).  As discussed further below when addressing the possibility of pretext, it is clear from the record that the GMEC -- and specifically when considering testimony of Drs. Morris and Levy -- acknowledged and considered the difficulty of distinguishing between Sung's disease and his performance.  That is, the GMEC considered all relevant circumstances.

After the GMEC issued its decision, Sung's counsel appealed to Brig. Gen. Gallagher on December 28, 2010.  Doc. No. 1, Compl. ¶ 35; *Sung*, 2011 WL 4952617, at *4.  General Gallagher reviewed the applicable policies and

35

regulations, Sung's records, the transcript of the GMEC hearing, and Sung's written appeal.  He also interviewed staff physicians and administrators, and a psychiatrist who had evaluated Sung.  On February 9, 2011, he upheld the GMEC, and Sung's termination became final.  *Sung*, 2011 WL 4952617, at *7.[9]

It follows without question that Sung was given sufficient due process in the termination proceedings before the GMEC.  His proceedings easily satisfied due process when measured against the requirements set forth in *Stretten* and *Ong*.  Under an "independent judicial determination," *Porter*, 592 F.2d at 780, the Due Process Policy certainly passes constitutional scrutiny.  And Sung cannot seriously argue that the Due Process Policy was not followed in all relevant respects.  Rather, he argues most strenuously that he was deprived of due process because his dismissal was a pretext for disability discrimination.  In other words, he contends that he was dismissed because of his disability (a depressive disorder), and not because of academic or surgical failings.

--------

[9] Plaintiff again alleges that Brig. Gen. Gallagher's decision was late, as the Due Process Policy states that "written notification of the decision regarding an appeal must be provided to the trainee within *two working days* following receipt of the appeal."  Doc. No. 8-13, Defs.' Mot. Ex. 13, at 21 (emphasis added).  It is unclear whether this means the TAMC Commander must notify a resident within two days that the Commander has decided the appeal, or that the Commander must actually decide the appeal within two days.  In any event, even if Brig. Gen. Gallagher's decision was late under the latter interpretation, there is no showing that not deciding the appeal within two days was prejudicial to Sung or that his due process rights were otherwise violated.

In this regard, Sung claims an Army Medical Evaluation Board ("MEB") -- rather than the GMEC -- was the appropriate body to make a medical determination. Sung believes the GMEC was "ill-equipped" to make a termination decision based on a medical condition. If an MEB had determined that Sung did not meet retention standards, it could have referred him to a Physical Evaluation Board, where additional due process protections would apply. *See Sung*, 2011 WL 2610136, at *7 (citing Doc. No. 17-9 in Civ. No. 11-00103). By convening a GMEC -- so Sung's argument goes -- the Army deprived him of the opportunity for his counsel to actively participate in the process.[10] Sung also contends General Gallagher should have consulted with officials familiar with his ongoing participation in the Impaired Healthcare Personnel Program ("IHCPP").

The Army points out, however, that neither an MEB nor the IHCPP is qualified to assess academic matters such as whether a physician should be terminated from a medical residency program. Rather, an MEB is used to

---

[10] Sung argues that questions by his counsel during the GMEC hearing could have clarified that his termination was based on his disability and not on his performance, and thus amounted to a due process violation. But, again, the record reflects that this issue (whether termination was recommended because of disability, or performance) was a central concern during the proceedings, especially during the testimony of Drs. Morris and Levy. The proceedings gave ample opportunity for exploration of Sung's ability to perform as a surgeon, both while his depressive disease was "in remission" and while it was episodic. *See, e.g.*, Doc. No. 8-10, Defs.' Mot. Ex. 10 at 39-43, 49-54. The Due Process Policy provided Sung sufficient opportunity to present his position on this specific issue.

37

determine whether a soldier is "fit for duty," and, if not, whether he or she should be dismissed from active duty.  Doc. No. 8-18, Defs.' Mot. Ex. 18 at 4.  Likewise, the IHCPP's function is "to provide support, assistance, and rehabilitation to those healthcare personnel who suffer from a condition that negatively influences, or has the potential to negatively influence, optimal performance."  *Sung*, 2011 WL 2610136, at *7 (citing Doc. No. 17-6 in Civ. No. 11-00103).  These bodies have no defined role in medical residency decisions.  Sung was not deprived of due process even if the Army could have convened an MEB to address Sung's fitness, and even if it could have gained further insight by considering the IHCPP.

### 3. *Pretext for Disability Discrimination*

As with a due process challenge, Sung's disability challenge based on pretext also fails.  In so finding, the court recognizes that the decision to terminate Sung involves both (1) a military determination regarding an active-duty officer's training, and (2) a professional school's judgment regarding qualifications to be a general surgeon and not simply a physician.  *See, e.g.*, *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) (reasoning that courts "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest" in cases involving "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military

force") (citations omitted); *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 817 (9th Cir. 1999) ("[A]n educational institution's academic decisions are entitled to deference" because "courts generally are 'ill-equipped,' as compared with experienced educators, to determine whether a student meets a university's 'reasonable standards for academic and professional achievement.'") (quoting *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999)).

   a. *Federal disability discrimination statutes do not apply*

   Sung previously asked this court in *Sung I* (and he appears to renew this request here) to examine and apply the principles in *Zukle*, in which the Ninth Circuit upheld the termination of a medical student, but did so where the University of California had provided "reasonable accommodations" to the student as required by the Americans with Disabilities Act, 42 U.S.C. § 12132 (the "ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  *Zukle*, 166 F.3d at 1048-50.  *Zukle* cautioned that, in enforcing the ADA and Rehabilitation Act, courts "must be careful not to allow academic decisions to disguise truly discriminatory requirements."  *Id.* at 1048.  Sung argues that he was terminated ostensibly for "academic" reasons but where -- in contrast to *Zukle* -- no accommodations for his disability were provided.

   *Zukle* is unpersuasive.  First, *Zukle's* reasoning stems entirely from

requirements of the ADA and the Rehabilitation Act.  Its discussion of "reasonable accommodations," and whether particular requested accommodations would fundamentally alter the medical school curriculum, is based on those particular federal laws.  But neither the ADA nor the Rehabilitation Act applies to Sung as a uniformed member of the armed forces.  *See*, *e.g.*, *Coffman v. Michigan*, 120 F.3d 57, 59 (6th Cir. 1997) ("[C]laims under the Rehabilitation Act [and the ADA] may not be asserted by uniformed members of the armed forces."); *Doe v. Garrett*, 903 F.2d 1455, 1462 (11th Cir. 1990) (holding that uniformed military personnel have "no remedy under the Rehabilitation Act"); *Smith v. Christian*, 763 F.2d 1322, 1325 (11th Cir. 1985) (reasoning that the Rehabilitation Act did not override the Navy's countervailing statutory authority to prescribe physical qualifications for sailors); *see also* 42 U.S.C. § 12111(5)(B)(i) (providing under the ADA that "the term 'employer' does not include the United States"); and 29 C.F.R. § 1614.103(d)(1) ("[The Rehabilitation Act] does not apply to . . . Uniformed members of the military departments[.]").

Because the Rehabilitation Act does not apply, it cannot form the basis of a legal duty by the Army to provide reasonable accommodations to an active duty military resident before considering whether to terminate his or her residency.  Aside from the Rehabilitation Act, Sung's Complaint mentions several

40

sets of regulations that he claims provide a basis for this court to find a duty to accommodate his disability.  *See* Doc. No. 1, Compl. ¶ 39 (citing 32 C.F.R. § 56.4 (providing in part, "It is DoD policy that no qualified handicapped person shall be subjected to discrimination on the basis of handicap under any program or activity that receives or benefits from Federal financial assistance[.]"); 32 C.F.R. § 56.8 (setting forth "Guidelines for determining discriminatory practices"); Department of Defense ("DOD") Directive 1020.1, Nondiscrimination on the Basis of Handicap in Programs and Activities; and Army Regulation 600-7).

These regulations likewise do not support Sung's position.  Title 32 C.F.R. Part 56 contains the regulations implementing the Rehabilitation Act.  *See* 32 C.F.R. § 56.1 ("This part implements section 504 of Public Law 93-112, "Rehabilitation Act of 1973[.]").  Similarly, DOD Directive 1020.1 specifically refers to the Rehabilitation Act in its prefatory paragraph.  *See Sung*, 2011 WL 2610136, at *9.  And, in turn, Army Regulation 600-7 "implements DOD Directive 1020.1" and contains the same language of the Rehabilitation Act.  *Id.* If the Rehabilitation Act itself does not apply to active duty military members, its regulations also do not apply.

Moreover, the cited regulations do not create a private right of action for a violation.  *See, e.g.*, *Hanson v. Wyatt*, 552 F.3d 1148, 1157 (10th Cir. 2008)

41

("To the extent that Col. Hanson may be suggesting that the alleged violation of [the military regulation] in itself gives him a cause of action, this theory fails [because] [t]he Supreme Court . . . will rarely recognize an implied private cause of action arising from a mere regulation.") (citing *Alexander v. Sandoval*, 532 U.S. 275 (2001)); *see also Idahosa v. Blagojevich*, 2006 WL 6322685, at *6 (C.D. Ill. Mar. 9, 2006) ("Regulations generally prohibiting discrimination do not transform Plaintiff's discrimination claims [against the military] into justiciable matters.").

      b.    *The GMEC considered non-discriminatory factors*

Even applying *Zukle's* general concept that "the court must be careful not to allow academic decisions to disguise truly discriminatory requirements," 166 F.3d at 1048, the record provides ample evidence that the GMEC fully considered Sung's performance -- a non-discriminatory factor -- in its decision. Dr. Kellicut emphasized repeatedly that Sung's performance was "tumultuous" and "not predictable" on a daily basis. Doc. No. 8-10, Defs. Mot. Ex. 10 at 9, 18, 20, 24, 26, 29, & 31. That viewpoint was shared by others. *Id.* at 24-25 ("I have the backing of every attending -- that we do not feel that surgery is the right fit for you based on performance."), and 87 ("[O]ur staff feels that it was with unanimity that [Sung should not be allowed to graduate and be a fully functional surgeon on his own.]"). Evidence indicates performance problems even when Sung's

depression was not episodic.  *See, e.g.*, *id*. at 108.

As to pretext, the court recognizes that is difficult to separate Sung's disability from his performance -- a reality that Dr. Kellicut and others repeatedly acknowledged.  *See, e.g.*, *id*. at 26, 29-31, 74-76, 87-90, 102-03.  Sung *admitted* the difficulty.  *See id.* at 90 ("There's no clear way to me to separate my diagnosis and its worsening from the decline in my performance.").  Whether that difficulty of separating Sung' disease from his performance could amount to unlawful disability discrimination is not a question directly before the court.  But what is clear is that the GMEC considered and balanced Sung's disease with the concomitant duty of the Army to produce qualified general surgeons.  Dr. Kellicut testified to this several times.  And his words before the GMEC bear repeating:

> [W]e also have an obligation, I think, ultimately to society . . . [to] train [surgical residents] with the understanding that once they leave here, they go forward, able to perform at a given level wherever the Army might send them . . . it could be on the battle field of Iraq or Afghanistan. . . .  [O]nce they've completed their training, regardless of where they're sent, they have to be prepared.  And to prepare them for their role as a surgeon in the United States Army, we have specific guidelines . . . we have standards.

*Id.* at 8-9.  He reiterated his duty:

> [I]t is the obligation of a program director . . . to ensure that the resident demonstrates sufficient competence to

> enter practice without direct supervision. . . .  My
> obligation to the soldiers who wear the uniform, to his
> future patients . . . [i]s that the individual [be] competent
> and dependable to go out and practice surgery
> independently[.]
> . . . . [F]rom a surgical standpoint [we] take care of very
> sick people who have very small margins for error.

*Id.* at 17-18.  Based on his observations, Dr. Kellicut told the GMEC:

> . . . .  [A]s I looked back at [Sung's] performance,
> patterns of performance, consistency of performance, I
> came to the decision that for me personally, and I took
> this to the surgery staff, I do not feel that CPT Sung has
> demonstrated through his chief resident year on
> numerous occasions a pattern of consistency.
> . . . .
>          I personally am very fearful that if CPT Sung is
> allowed to continue to ultimately go out and practice
> surgery, that this pattern or performance will repeat itself
> and someone will get hurt.
>          Again, the obligation to society, the obligation to
> the men and women in uniform is something that I do not
> take lightly.

*Id.* at 20-21.  Dr. Zagorski, a witness called by Sung, supported this rationale by

testifying:

> . . . . And as a general surgeon, . . . you're the man. . . .
> And when somebody's bleeding or blown up, it's not the
> intensive care nurse putting them back together, it's the
> general surgeon.  And you either do it or you don't.  And
> oftentimes, you are doing things that you've never done
> before.

*Id.* at 84.  He told Sung at the hearing:

44

> . . . . I don't think you have . . . the competency to be a
> general surgeon.  And you are able to perform as a
> resident, but there are grave -- there are concerns that
> you will not be able to be competent as an . . .
> independent surgeon.

*Id.* at 82.  Dr. Zagorski was asked whether Sung possesses competency for

independent practice of surgery, and responded "[n]ot even to his own -- even by

his own admission, not a hundred percent of the time."  *Id.* at 86.  He repeated:

> I do not feel Dr. Sung is not competent to be a physician.
> I just don't think he possesses the competency to be a
> surgeon . . . .  I don't believe he possesses some of the
> intangibles in order to allow him to fully be competent in
> every situation.  And competency requires bringing a
> minimum level of skill to every single situation.

*Id.* at 88.

Given the preceding testimony, and from a complete review of the

current record, the termination of Sung from the TAMC residency program was

not arbitrary and capricious.  It was supported by substantial evidence, and

(applying § 706(2)(B)) it comported with constitutional principles.  Further -- even

assuming that the Army has a general policy to refrain from disability

discrimination -- there is no applicable federal statutory disability claim under the

ADA or Rehabilitation Act, and the termination was ultimately based on non-

discriminatory factors.  In this regard, the court agrees with the essential

conclusion of the Army Surgeon General made during the ABCMR proceedings:

Although "Sung's depression is certainly a mitigating factor . . . it does not

absolve him of the responsibilities of meeting established academic and

professionalism standards."  Doc. No. 8-19, Defs.' Ex. 19 at 19.  As the Army

Surgeon General observed:

> [m]ultiple psychiatrists testified on his behalf.  At least
> two psychiatrists and one psychologist were voting
> members of the GMEC present for the hearing.  Given
> the testimony heard and the composition of the GMEC, it
> is not conceivable that his depression served as the basis
> for the decision to terminate him from training.
> Testimony shows there were multiple issues to
> consider[.]

*Id.*

In sum, Sung has not demonstrated any triable issue of material fact --

the decisions of the GMEC to terminate Sung and of the ABCMR to uphold that

decision were not "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).  And neither decision was "contrary

to constitutional right," 5 U.S.C. § 706(2)(B), or otherwise in violation of § 702.

///

///

///

46

# V.  <u>CONCLUSION</u>

For the foregoing reasons, the court determines that it has subject matter jurisdiction, but GRANTS Defendants' Motion insofar as it seeks Summary Judgment.  That is, Defendants are entitled to Judgment on all claims asserted against them.  The Clerk of Court shall close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 26, 2013.



   /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Sung v. Doyle, et al.*, Civ. No. 13-00024 JMS-KSC, Order Granting in Part Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment